[Cite as *Przybyla v. Przybyla*, 2018-Ohio-3071.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

JOHN M. PRZYBYLA                     :
                                     :
        Plaintiff-Appellee/Cross-    :      Appellate Case No. 27852
        Appellant                    :
                                     :      Trial Court Case No. 2006-DR-665
v.                                   :
                                     :      (Appeal from Domestic Relations
MICHELLE C. PRZYBYLA                 :      Court)
                                     :
        Defendant-Appellant/Cross-   :
        Appellee

. . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of August, 2018.

. . . . . . . . . .

BRIAN A. SOMMERS, Atty. Reg. No, 0072821 and CRAIG M. SAMS, Atty. Reg. No. 0089716, 10532 Success Lane, Dayton, Ohio 45458
        Attorneys for Plaintiff-Appellee/Cross-Appellant

THOMAS M. DINEEN, Atty. Reg. No. 0037727, 683 Miamisburg-Centerville Road, Dayton, Ohio 45459
        Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, Michelle Przybyla ("Michelle"), appeals from a judgment modifying her spousal support and denying her motion to show cause. Plaintiff-Appellee/Cross-Appellant, John Przybyla ("John"), has also filed a cross appeal.

{¶ 2} Michelle presents ten assignments of error, which allege various errors, including: that the trial court lacked jurisdiction to modify support, that the court abused its discretion in modifying support; that the court's decision was against the manifest weight of the evidence; that the court erred in failing to consider income of John's current wife and erred in refusing to add the wife as a party; that the court erred in computing John's alleged support arrearage and in dismissing Michelle's motion to show cause; and that the court erred in finding that John's income for spousal support purposes did not include distributions from redemption of stock. John's sole assignment of error pertains to the trial court's decision to exclude the deposition of his doctor.

{¶ 3} After considering the assignments of error and the cross-assignment of error, we conclude that they are without merit. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} On June 7, 2006, John filed a complaint seeking a divorce from Michelle. According to the complaint, they were married in July 1975 and had four children, two of whom were emancipated. Of the remaining children, one was nearly 17 years old and the other was 13 years old. Michelle filed an answer and counterclaim for divorce on June 16, 2006.

{¶ 5} The case did not proceed to trial. Instead, the parties entered into a separation agreement; a divorce decree, incorporating the separation agreement, was then filed on March 9, 2007. When the decree was filed, John was employed by Woolpert, Inc., and Michelle had recently finished school to become a massage therapist. Michelle also had a degree as a registered nurse and was licensed in Ohio, but had not worked during most of the marriage.

{¶ 6} The parties had substantial assets and few debts. Under the separation agreement, Michelle received $120,891 in cash, and John received $44,024. They each later received $52,000 from the sale of the marital home.

{¶ 7} John retained $386,234 in Woolpert stock because company policy required stockholders to be full-time owners of the company and precluded division of this asset.[1] To equalize the assets, Michelle was given $320,798 in retirement accounts, including $87,423 in a T. Rowe Price account; $210,000 from John's Woolpert 401(k) account; $16,523 in a Fifth Third IRA account; and $6,852 contained in another Fifth Third IRA account. John retained $5,111 from the Woolpert 401(k) account. Thus, the respective distribution of assets was $441,689 for Michelle and $435,369 for John. After the money received from the sale of the house is added, Michelle received $493,689 and John received $487,369.

{¶ 8} In addition, Michelle received one-half of the martial portion of John's defined benefit plan with Woolpert. QDROs were subsequently filed with respect to this asset and the other retirement accounts that Michelle received.

---

[1] The actual value of the stock was $409.584, but $23,350 was deducted because John owed that amount for his buy-in of stock.

**{¶ 9}** The separation agreement also provided for child support and spousal support. John retained custody of the older child, and Michelle was not ordered to pay any child support. John agreed to pay $1,006 per month in child support for the other child, with support to cease in 2011, when the child turned 18 years old or graduated from high school.

**{¶ 10}** Regarding spousal support, the separation agreement contained a provision for payment of spousal support of $3,750 per month indefinitely, plus certain additional payments based on John's receipt of additional income over $135,000 as well as bonuses. Additionally, the separation agreement reserved the court's continuing jurisdiction as to the amount and duration of spousal support. Docket #32, Separation Agreement, pp. 3-4.

**{¶ 11}** Prior to cessation of child support payments, spousal support was to be paid through the Child Support Enforcement Agency ("CSEA"); after that time, the parties agreed that John would pay spousal support to Michelle by electronically transferring funds from his banking institution to Michelle's banking institution. *Id.* at p. 7.

**{¶ 12}** Neither party appealed from the filing of the divorce decree, and no post-decree motions were filed until November 8, 2016, when John filed a motion to terminate his spousal support obligation. John stated in the motion that he anticipated retiring on March 1, 2017, due to recently discovered health issues.

**{¶ 13}** On December 9, 2016, Michelle filed a motion to dismiss John's motion, based on alleged lack of jurisdiction. The same day, Michelle also filed a motion seeking to have John held in contempt. She claimed in the motion that John had failed to pay spousal support and had failed to provide her with verification of any change in his annual

income and bonuses received.

{¶ 14} Subsequently, on April 7, 2017, John filed an amended motion to terminate spousal support or, alternatively, to modify spousal support. A magistrate then held an evidentiary hearing on May 30, 2017, at which time the magistrate heard testimony from John's accountant, John, and Michelle. After the hearing, the magistrate found a substantial change in circumstances and reduced John's spousal support obligation to $2,500 per month, indefinitely. The magistrate also overruled Michelle's motion to show cause, but did order John to pay $500 towards attorney fees in connection with a motion to compel discovery that Michelle had filed.

{¶ 15} Both sides filed objections to the magistrate's decision, and on December 12, 2017, the trial court filed a decision and judgment, sustaining both parties' objections in part and overruling both parties' objections in part. The trial court agreed that John had shown a substantial change in circumstances, but concluded that the magistrate had erred in including the present-day value of John's Woolpert stock in his income. The court further concluded that the magistrate erred in failing to include several sources of income as part of Michelle's annual income. These sources included: Michelle's income from miscellaneous investments; Michelle's portion of the Woolpert 401(k); Michelle's Woolpert pension; and Michelle's election to take against John's Social Security income. The court also overruled both parties' objections to the attorney fee award. Based on the court's calculation of the parties' incomes, the court reduced John's spousal support obligation to $750 per month.[2]

---

[2] This was based on an 80% reduction in John's income after he retired on March 31, 2017. At that time, without a social security election, John had $36,000 in income to Michelle's income of $37,000. If both parties elected to take social security, John's

{¶ 16} Michelle filed a notice of appeal on January 5, 2018, and John filed a cross-appeal on January 12, 2018.


II.   Issues Pertaining to a Change of Circumstances

{¶ 17} A number of Michelle's assignments of error are interrelated or overlapping, and will be considered together, where appropriate.   Michelle's First Assignment of Error states that:

> The Trial Court Erred and Abused Its Discretion by Improperly Applying the Controlling Statutory and Case Law in Its Determination that "A Substantial Change of Circumstances" Had Occurred Since the Time of the Divorce or the Previous Order as It Applies to Spousal Support.

{¶ 18} Under this assignment of error, Michelle initially contends that a party must establish a substantial change of circumstances before a trial court can exercise jurisdiction over a motion to modify spousal support.   According to Michelle, this means that trial courts are required to hold bifurcated hearings; in the first hearing, the court must decide if a substantial change exists.   If that is the case, the court then holds a second hearing to consider whether support should be modified.   Both the trial court and magistrate rejected this argument.

{¶ 19} R.C. 3105.18(E) states, in pertinent part, that a court lacks jurisdiction to modify spousal support awards unless it "determines that the circumstances of either party have changed and unless * * * [i]n the case of a divorce, the decree or a separation agreement of the parties to the divorce that is incorporated into the decree contains a

_____

income would be $62,300, and Michelle's income would be $50,000.

provision specifically authorizing the court to modify the amount or terms of alimony or spousal support."

{¶ 20} There is no dispute here that the parties' separation agreement, as incorporated into the decree, reserved jurisdiction to modify spousal support. Thus, the only "jurisdictional" issue was whether John demonstrated a change of circumstances. Notably, R.C. 3105.18 does not require bifurcated hearings in situations where a party asks to modify support; in fact the statute does not even mention hearings or the form of any hearings.

{¶ 21} Michelle has also not submitted any relevant case law indicating that a bifurcated approach is mandated. Instead, Michelle relies on *Morris v. Morris*, 148 Ohio St.3d 138, 2016-Ohio-5002, 69 N.E.3d 664, in which the Supreme Court of Ohio observed that its own procedural rules cannot enlarge substantive rights conferred by R.C. 3105.18(E). *Id.* at ¶ 32.

{¶ 22} *Morris* has nothing to do with the situation before us, as it only involved whether Civ.R. 60(B) could be used to allow relief from spousal support judgments based on fraud and mistake. In rejecting the application of the rule, the court noted that Civ.R. 60(B) and R.C. 3105.18(E) have different requirements for modifying judgments. *Id.* The court commented that the General Assembly's amendment of R.C. 3105.18 in 1986 had "swept away all the common law enunciated [in the court's prior decisions], * * * including * * * that a trial court had the authority to modify a spousal-support award if there was fraud or mistake even though the decree did not reserve jurisdiction, * * * and * * * that a trial court had the authority to modify a spousal-support award if there was 'mistake, misrepresentation or fraud' even though the decree did not reserve jurisdiction * * * ." *Id.*

at ¶ 28, citing *Mandelbaum v. Mandelbaum*, 121 Ohio St.3d 433, 2009-Ohio-1222, 905 N.E.2d 172, ¶ 24 and *Law v. Law*, 64 Ohio St. 369, 60 N.E. 560 (1901), and quoting *Newman v. Newman*, 161 Ohio St. 247, 118 N.E.2d 649 (1954), syllabus.

**{¶ 23}** *Morris* went on to note that "[t]he Modern Courts Amendment does not confer upon this court the authority to resurrect through a procedural rule a common-law remedy that was expressly superseded by the General Assembly in a statutory enactment." *Morris* at ¶ 32. While this statement is correct, it has no bearing on the situation before us.

**{¶ 24}** As was indicated, nothing in R.C. 3105.18 requires bifurcated hearings. We also have found no authority advocating or even suggesting such an approach. The concept is well-settled that courts have "inherent authority to control" their dockets. *Flynn v. Flynn*, 10th Dist. Franklin No. 03AP-612, 2004-Ohio-3881, ¶ 10; *Holbrook v. Holbrook*, 12th Dist. Warren No. CA2017-05-055, 2018-Ohio-2360, ¶ 17; *State v. Hayes*, 2d Dist. Montgomery No. 4753, 1975 WL 181605, *4 (July 25, 1975). Our own opinion is that bifurcated hearings would be a waste of judicial resources.

**{¶ 25}** Michelle further contends that in deciding whether a change of circumstances occurred, the trial court could only consider events occurring from the date of the divorce decree to the time the initial motion was filed in November 2016. According to Michelle, the trial court, therefore, erred in considering John's retirement as a substantial change in circumstances, since it actually occurred after his motion was filed.

**{¶ 26}** With respect to a change in circumstances, R.C. 3105.18(F)(1) provides that:

For purposes of divisions (D) and (E) of this section and subject to division (F)(2) of this section, a change in the circumstances of a party includes, but is not limited to, any increase or involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses, or other changed circumstances so long as both of the following apply:

(a) The change in circumstances is substantial and makes the existing award no longer reasonable and appropriate.

(b) The change in circumstances was not taken into account by the parties or the court as a basis for the existing award when it was established or last modified, whether or not the change in circumstances was forseeable.   (Footnote omitted.)

**{¶ 27}** The trial court rejected Michelle's argument, stating that:

Michelle next argued that John did not prove a change of circumstances.   In part, she argued that, because John filed his motion to modify the spousal support prior to the date he retired, his retirement could not be considered a change in circumstances.   The court disagrees.   John was diagnosed with cancer in late 2014.   His doctor then monitored his blood levels for a period of time.   When it was determined that the cancer had spread to his lymph nodes in November 2016, the prognosis for a full recovery changed for John.   When John started the treatment for stage four cancer, he realized he was not going to be able to continue working as he had, "at the level and at the performance that was expected of me, and what I expected of myself."   It was at that time that John filed for

modification/termination of spousal support. To his credit, John did not retire immediately, but continued to work during his cancer treatments until he was able to smoothly transition out of the company. The magistrate made the modification retroactive to his date of retirement, when the economic impact occurred to John, not to the date he filed his motion. The change in circumstances, the magistrate determined, was the substantial decrease in his income level upon his retirement, not just the potential increase in medical expenses as Michelle argued. Michelle's objection is not well taken.

December 12, 2017 Decision and Judgment, p. 14.[3]

**{¶ 28}** We agree with the trial court. We also rejected a similar argument in *Buch v. Buch*, 2d Dist. Montgomery No. 20878, 2005-Ohio-4491. In that case, the appellant claimed that the issue of spousal support was not ripe for consideration because a substantial change of circumstances had not yet occurred, and further contended the issue of ripeness was jurisdictional. *Id.* at ¶ 17. The appellee in *Buch* had been diagnosed with Alzheimer's disease and was unable to be employed any longer as a psychologist due to diminished mental capacity. *Id.* at ¶ 21.

**{¶ 29}** We commented that "[t]he basic principle of ripeness may be derived from the conclusion that 'judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical

---

[3] For some reason, the clerk did not transmit the full docket of the trial court. However, we were able to access the online docket. Where possible, we will cite to actual docket numbers. Otherwise, the reference will be to the date and page numbers of the document being discussed.

or remote.' " *Id.* at ¶ 18, quoting *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82 Ohio St.3d 88, 89, 694 N.E.2d 459 (1998). We went on to stress that "the spousal support issue before us is not abstract, hypothetical, or remote. [Appellee] moved for spousal support, arguing the existence of a substantial change of circumstances. The trial court found the motion to be persuasive and awarded spousal support. Regardless of whether the trial court properly sustained [Appellee's] motion, the spousal support issue is ripe for review." *Id.*

**{¶ 30}** The same observations apply here. Like the disease in *Buch*, the progression of John's cancer to stage four in the fall of November 2016 and its effect on his employment was hardly a hypothetical, abstract, or remote situation. In addition, parties have filed motions to terminate or reduce support shortly before an anticipated retirement. *See, e.g.*, *Melhorn v. Melhorn*, 2d Dist. Montgomery No. 11139, 1989 WL 8452, *1 (Jan. 30, 1989) (obligor filed motion to terminate support in mid-April 1988, based on planned retirement on May 31, 1988).

**{¶ 31}** Furthermore, even if this were otherwise, Michelle's argument is also without merit because John filed a motion to amend his original motion on April 7, 2017. This was after John retired on March 31, 2017. The evidentiary hearing was not held until May 30, 2017, and the magistrate's decision indicated that the court was considering John's "November 8, 2016 Motion to Terminate Spousal Support as amended on April 7, 2017." July 17, 2017 Magistrate Decision, p. 1. Moreover, as the trial court noted, the spousal support modification was effective only as of the date that John retired (March 31, 2017), not retroactive to the date that the initial motion was filed.

**{¶ 32}** Under this assignment of error, Michelle also argues that the trial court erred

in modifying spousal support based on a finding of a substantial change in circumstances. In this regard, Michelle focuses on the contention that John's anticipated medical expenses did not increase between the time the decree was issued and when he filed his motion. Michelle also argues that there was no substantial "economic" change in circumstances because John was able to earn sizeable amounts in 2015 and 2016 even while he had cancer.

{¶ 33} We review decisions modifying spousal support orders for abuse of discretion. *Denmark v. Denmark*, 2d Dist. Montgomery No. 26438, 2015-Ohio-4292, ¶ 37. An abuse of discretion occurs when a court's attitude is unreasonable, arbitrary, or unconscionable. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.* The party seeking a reduction of spousal support also has the burden of proving that a reduction is warranted. *Reveal v. Reveal*, 154 Ohio App.3d 758, 2003-Ohio-5335, 798 N.E.2d 1132, ¶ 14 (2d Dist.). After reviewing the record, we find no abuse of discretion.

{¶ 34} "R.C. 3105.18(F) sets forth a partial listing of what can be considered as a change of circumstances * * *." *Mandelbaum*, 121 Ohio St.3d 433, 2009-Ohio-1222, 905 N.E.2d 172, at ¶ 31. Trial courts, therefore, are not confined only to the specific items listed in R.C. 3105.18(F) ("any increase or involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses"), but may consider "other changed circumstances" as well. Furthermore, R.C. 3105.18(F) does not use the words

"substantial *economic* change of circumstances." It only requires that a change in circumstances be "substantial." As noted in *Mandelbaum*, courts have used words like "significant," "drastic," and "material" to describe the word substantial. *Id.* at ¶ 32.

{¶ 35} In this case, there is no dispute that John's stage four cancer diagnosis was a substantial change in circumstances and was unforeseen at the time of the divorce. Michelle admitted this at the hearing, but characterized it as a change in "physical" circumstances. Transcript of May 30, 2017 Proceedings ("Tr."), p. 211. While this is true, R.C. 3105.18(F) does not limit changes in circumstances solely to economic changes. Furthermore, even if a change in economic circumstances were required, such circumstances were clearly present, due to the impact John's health had on his ability to continue to work, i.e., to earn income.

{¶ 36} We have said that "[a] change in income due to retirement reasonably in advance of the expected date of retirement does provide a basis for modification of alimony if it was not done in an attempt to avoid a court ordered obligation to an ex-spouse." *Melhorn*, 2d Dist. Montgomery No. 11139, 1989 WL 8452, at *2. In the case before us, there is no indication that John retired early in order to deprive Michelle of spousal support. To the contrary, the evidence at the hearing revealed that John's retirement and decreased income was, in fact, involuntary, due to his stage four cancer and inability to continue in a very demanding job.

{¶ 37} According to the evidence, John was first diagnosed with prostate cancer at the end of 2014. At that time, he had a higher than normal PSA and was referred to a urologist, Dr. Litscher, who decided to continue quarterly testing. After initially being diagnosed, John was able for some time to continue with his rigorous employment

demands, which included a great deal of travel. PSA testing continued in 2015 and 2016.

{¶ 38} In July 2016, John's PSA level rose to 37, and while Dr. Litscher was concerned, he thought it might be a false positive. The doctor, therefore, decided to test again in a month. Due to John's travel schedule, the test was done two months later, and the PSA level at that time had increased to 73. Two days later, a biopsy was done and showed a highly aggressive cancer. Tr. at pp. 101-102 and Plaintiff's Ex. 24. John then had a CT scan and bone scan to see if the cancer had spread beyond the prostate. These tests showed the cancer had spread to the lymph nodes in John's abdomen, and this was confirmed by another biopsy. The result was that John had stage four prostate cancer. Tr. at pp. 103-104. John was placed on antiandrogen treatment, and he experienced side effects from the medication.

{¶ 39} John found out about the cancer in his lymph nodes in October 2016, and in November 2016, the effect of the medication and its impact on his health became clear. John realized that he could not continue working at the level and performance expected of him and that he expected of himself. Due to the medication, he had trouble sleeping, which affected his ability to concentrate and his ability to stay awake during the day. John was a professional registered engineer and worked on critical projects implementing software to support public agencies. He experienced a lower level of ability to concentrate and converse in meetings, and his energy level was significantly decreased. In addition, John also had problems with memory loss and dealing with every aspect of his job.

{¶ 40} John testified that if he were in good health, he would still be employed.

He stated that he had previously committed to continue working for quite some time, until a normal retirement age, which would be age 65. (At the time he retired, John was 62 years old.)

{¶ 41} On November 8, 2016, John filed a motion to terminate spousal support, anticipating a retirement date of March 1, 2017. He eventually retired on March 31, 2017. John indicated that it took some time to transition because he had a critical role in projects he was supporting.

{¶ 42} Michelle did not present any evidence disputing that John had stage four cancer, that he had experienced significant side effects, or that he needed to retire. In fact, Michelle agreed that it was not "unreasonable for John to retire based on 40 something years of work, stage 4 prostate cancer. And the fact that he is able to draw on his pension and social security * * *." Tr. at p. 211.

{¶ 43} Accordingly, the trial court did not abuse its discretion by concluding that John had a substantial change of circumstances that made the existing award no longer reasonable and appropriate, and that the change was not taken into account when the spousal support order was established. R.C. 3105.18(F)(1)(a) and (b). Because John established the requirements for modifying spousal support, the trial court was entitled to recalculate spousal support.

{¶ 44} Michelle also contends that John failed to show a substantial change of circumstances with respect to the amount of medical expenses he had at the time of the divorce compared to his medical expenses when he filed the motion to terminate or modify support. Michelle points out that John's estimated medical expenses in affidavits of income and expenses filed at both times were the same. Since John established a

substantial change of circumstances with respect to his unanticipated cancer and retirement, which caused a significant decrease in his income, whether he had different out-of-pocket medical expenses is irrelevant.

{¶ 45} Based on the preceding discussion, the First Assignment of Error is overruled.

### III. Alleged Abuse of Discretion in Weighing Support Factors; Manifest Weight Analysis

{¶ 46} Michelle's Second Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion in Failing to Consider All Relevant Factors Under R.C. 3105.18. The Trial Court's Ruling Is Against the Manifest Weight of the Evidence.

{¶ 47} Under this assignment of error, Michelle makes four main arguments, which we will address. However, she focuses on certain alleged errors and the trial court's alleged abuse of discretion, rather than on manifest weight arguments, and we will do the same.

{¶ 48} Again, we review decisions on spousal orders for abuse of discretion, as trial courts have broad discretion in such matters. *Long v. Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, ¶ 11 (2d Dist.).

{¶ 49} Michelle first argues that the trial court erred in reducing the support obligation because the court relied on the parties' income at retirement rather than when John's motion was filed. Based on our discussion above, this argument is without merit. The trial court properly considered the parties' current or potential current income.

{¶ 50} According to Michelle, the trial court also erred because it did not consider the parties' income prior to the filing of the motion to terminate support. We fail to see the relevance of this point. Since John had been diagnosed with stage four cancer and retired as a result, the appropriate consideration was not what he made before retiring.

{¶ 51} Michelle's third contention is that the trial court erred in imputing income to her in excess of her actual income. In calculating appropriate spousal support, the trial court imputed $3,000 in income to Michelle. During her testimony, Michelle stated that her corporation, "Healing Hands," was formed in 2007 and had made a profit only one year since. The tax returns for the corporation indicate that Michelle has been spending more than $5,000 per year for rent and about $2,000 per year for a telephone. Her income has been minimal, and in most years, has not been sufficient to cover her expenses. Despite these facts, Michelle testified that her lack of profitability did not indicate that she ought to find a different line of work. Tr. at p. 210.

{¶ 52} At the time of the divorce, Michelle was 51 years old, had a degree as a registered nurse, and had recently completed schooling to become a massage therapist. There is no indication that she had any health problems or could not work full-time. At the time of the support hearing in 2017, Michelle stated that she had no health problems and that there was no reason why she could not work full-time.

{¶ 53} The tax returns of Michelle and her S-corporation, Healing Hands, indicate that Michelle was able to take advantage of business income loss on her tax returns. See Plaintiff's Exs. 2A-2C and 3B-3F. In addition, the 2014 tax returns reveal that Michelle made an income of $2,952 that year. Plaintiff's Exs. 2-B and 3-C. Taking these matters into consideration, John's expert, Allen Duvall, included $3,000 in yearly

income for Michelle due to her ownership of Healing Hands.

{¶ 54} Under the circumstances, the trial court did not err in crediting Michelle with $3,000 in income from her business. Although the trial court did not choose to find Michelle voluntarily unemployed, it could have done so and could have imputed a minimum wage at 40 hours per week, for a total yearly income of $16,952 (40 times $8.15 equals $326 per week; 52 times $326 equals $16,952 per year).

{¶ 55} Michelle's final argument under this assignment of error is that the trial court erred by failing to consider the parties' relative assets and liabilities in calculating spousal support. She further contends that $750 per month does not even come close to meeting her monthly expenses of $4,920.

{¶ 56} The trial court's decision specifically states that both the magistrate and trial court did consider the factors in R.C. 3105.18(C). *See* Dec. 12, 2017 Decision and Judgment at pp. 17 and 21.

{¶ 57} In spousal support cases, we review the record to see if each factor relevant to the spousal support request was considered. *Long,* 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, at ¶ 28. While a trial court does not need to explicitly comment on each factor, "the court must set forth sufficient detail to enable a reviewing court to determine that the award is fair, equitable, and in accordance with the law." *Krankovich v. Krankovich*, 7th Dist. Harrison No. 16 HA 0001, 2016-Ohio-8215, ¶ 11, citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 518 N.E.2d 1197 (1988), paragraph two of the syllabus. *See also Fiamengo v. Fiamengo*, 2d Dist. Montgomery No. 26704, 2016-Ohio-4720, ¶ 15. At the least, the underlying basis for the award must be stated. *Krankovich* at ¶ 11, citing *Schneider v. Schneider*, 110 Ohio App.3d 487, 494, 674 N.E.2d 769 (11th Dist.1996).

Courts have "found there is a presumption that the trial court considered all of the spousal support factors when the court states that it did so within its entry." *Campbell v. Campbell*, 12th Dist. Warren No. CA2009-04-039, 2009-Ohio-6238, ¶ 22. *Accord Smith v. Smith*, 182 Ohio App.3d 375, 2009-Ohio-2326, 912 N.E.2d 1170, ¶ 115 (2d Dist.) (noting presumption that trial court considered statutory factors); *Albers v. Albers*, 2d Dist. Greene No. 2012 CA 41, 2013-Ohio-2352, ¶ 51; *Grody v. Grody*, 10th Dist. Franklin No. 07AP-690, 2008-Ohio-4682, ¶ 26.

**{¶ 58}** Regarding these factors, R.C. 3105.18(C) provides that:

(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

{¶ 59} In deciding whether to modify support, courts consider only the relevant factors. *Kucmanic v. Kucmanic*, 119 Ohio App.3d 609, 613, 695 N.E.2d 1205 (8th Dist.1997) (stressing that most factors remain static, so there is no need to rehash findings from original spousal support order). *Accord McHenry v. McHenry*, 2d Dist. Montgomery No. 20345, 2004-Ohio-4047, ¶ 17-18.

**{¶ 60}** The potentially pertinent factors here are R.C. 3105.18(C)(1)(a), (b), (c), (d), (g), (h), (i), (l), and (m), and the court considered these points, at least to the extent evidence was presented. *See* Dec. 12, 2017 Decision and Judgment at pp. 17-22.[4]

**{¶ 61}** Contrary to Michelle's claims, the trial court did specifically consider the size of both parties' current assets; there is no requirement that the ratio of the parties' assets be equal or at a particular level. *Id.* at pp. 20-21. Both parties had substantial assets, and this was many years after the divorce. The court also noted that since the divorce in 2007, John had continued to work, had paid Michelle about $905,000 in spousal support, and currently owed her $70,000 in spousal support based on bonuses from Woolpert. *Id.* at p. 21. Furthermore, the court considered the parties' relative earning abilities and health concerns, and found that neither party had the ability to earn significant additional income. *Id.* at p. 21-22. The court also stated that after John retired, his income had decreased by 80% and that John had "a potentially reduced life expectancy as well as the expectation of medical expenses for his cancer treatment." *Id.* at p. 22.

**{¶ 62}** In its decision, the trial court stressed that Michelle failed to present any expert testimony to contradict the assessment of John's expert about the parties' incomes and assets. *Id.* at p. 19. We agree.

**{¶ 63}** Notably, the magistrate found John's expert credible, and the trial court agreed. *Id.* We defer to trial court decisions on credibility. "The underlying rationale

---

[4] No evidence was presented regarding the standard of living during the parties' marriage, tax consequences of a spousal support award, or specific lost production activity. R.C. 3105.18(C)(1)(g), (l), and (m). The latter category is irrelevant, as that would have been taken into account at the time of the divorce. Specifically, Michelle was not in the workforce during the marriage. However, nothing prevented her from engaging in full-time work after the divorce.

of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Based on the preceding discussion, we see no evidence that the trial court improperly considered the statutory factors.

{¶ 64} According to Michelle, the trial court should have included certain distributions that John was scheduled to receive from Woolpert for redemption of stock. John's expert, Allen Duvall, was a certified public accountant and a law school graduate. Duvall reviewed a substantial number of documents and prepared a cash flow analysis for both John and Michelle. *See* Plaintiff's Exs. 27 and 30.

{¶ 65} Duvall noted that, when John retired, he was forced to redeem his Woolpert stock because he was no longer an employee of the closed corporation. John and Woolpert agreed to a pre-tax value of $819,000 for 10,500 shares, which would be paid out over the next nine years. At the time of the divorce, John had 9,500 shares of stock, which were then valued at $409,584, subject to a loan that John was required to pay for his buy-in to the business. John purchased additional shares after the divorce.

{¶ 66} According to Duvall, the cash-out of the shares was neither recurring income nor distributions, but was "a return of capital. [John] basically had stock at [the] time of divorce, acquired some more stock after divorce, which was [p]ost marital and therefore, non-marital. And he's simply getting redeemed out of all his shares. So none of it would constitute marital income." Tr. at p. 48. Duvall also indicated that these distributions would be subject to about $129,000 in taxes, after accounting for the price

John paid for the stock.

{¶ 67} In calculating John's cash flow, Duvall ascertained what income could be earned on the Woolpert stock redemption for 2017, which he calculated would be about $85,000 after taxes. Duvall added in $87,000 in miscellaneous investments that John had, and then subtracted the back alimony owed of $70,000. Duvall also subtracted $32,000 that he assumed John would pay for current debts. That resulted in a net amount of $70,000, to which Duvall applied a conservative income return of 4%, and resulted in income on the investment of $2,800. This was added to John's other items of cash flow, which included a 4% return ($16,200) on $406,000 in John's Woolpert 401(k) account; $17,300 received from John's Woolpert pension, and $26,000 received for John's Social Security pension. This resulted in a total income of $62,300, from which Duvall subtracted $4,300 in taxes to arrive at an annual income of $58,000.

{¶ 68} Using the same process, Duvall calculated a 2017 income for Michelle based on her net investments of $91,000 (which included receipt of the $70,000 in back spousal support), less payment of Michelle's debts of $44,000. Four percent of this amount resulted in income of $3,600. See Ex. 30. Duvall added this to a 4% return ($17,200) on Michelle's 401(k) account. He also added in Michelle's receipt of $13,200 from the Woolpert pension, $3,000 from Healing Hands, and $13,000 from her election to draw on John's Social Security. This analysis indicated a total income of $50,000 per year, and with a deduction for taxes, resulted in $46,000 in annual income for Michelle.

{¶ 69} When the trial court calculated the parties' respective incomes, it noted that, exclusive of Social Security (which neither party had yet taken), and as determined by Duvall, John had $36.300 in annual income, and Michelle had $37,000 in annual income.

The support awarded to Michelle of $750 per month would provide her with an annual income of $46,000. John's income, in that instance, would be $27,300.[5]

{¶ 70} Michelle offered nothing to refute Duvall's testimony, and we find no error in the decision not to include the total Woolpert stock redemption amount in John's income for purposes of calculating spousal support. As Duvall noted, this was not "income," but was simply a transfer of a stock investment to cash, which like any other investment, could be used to generate retirement income. One might argue that the income return for the remaining eight years of the Woolpert stock could have been calculated and would have resulted in somewhat higher income for John. For example, Ex. 14A indicates that John's redemption amount for 2018 would be $134,775. This is greater than the 2017 distribution of $101,081.25. That 2018 amount was to continue in 2019, 2020, and 2021. However, the remaining amounts distributed would drop to $69,975 in 2022, $48,375 in 2023, $48,375 in 2024, and $12,093.75 in 2025. After that, there would be no more distributions. Furthermore, in subsequent years, the parties may not have needed to offset their current debts against investment income; however, this factor is equally applicable to both parties.

{¶ 71} Nonetheless, the trial court did not act arbitrarily or unreasonably in focusing on Duvall's 2017 figures. In the first place, Michelle failed to present either expert evidence or contradictory figures. Second, the distributions decrease in value after a few years, and the income John could generate at that point would be considerably less. Finally, future distributions (and income available by investing the distributions) are

---

[5] If Social Security pensions were added, John would have an annual income of $53,300 ($62,300 minus $9,000 in spousal support paid to Michelle). Michelle's income would be $59,000 ($50,000 plus $9,000 in spousal support paid to her).

contingent upon or affected by on two factors: (1) whether John survives (meaning that in the event of his death, even if distributions would still be paid, spousal support would no longer be payable); and (2) while Woolpert is obliged to pay distributions, John's future ability to collect depends on Woolpert's financial strength and ability to pay. Accordingly, we find no abuse of discretion in the trial court's failure to include the total amount of the distributions as income or in the figures the court used to compare the parties' incomes for purposes of calculating spousal support. Comparison of the parties' current or potential current income was fair.

{¶ 72} Michelle also contends that she needs more spousal support based on her monthly expenses, which according to her financial affidavit, are about $4,774, or $57,300 annually. *See* Plaintiff's Ex. 5, filed on December 9, 2016. However, $1,829 of that amount consists of Michelle's debt, including $14,640 owed on a car loan and $29,435 in credit card debt – none of which existed at the time of the divorce. If Michelle uses the $70,000 in back spousal support to pay off her debt, as Duvall indicated, her expenses would be $2,946 per month, or $35,352 annually – which is less than her income before either spousal support or her available election to take against John's Social Security. These facts, respectively, add $9,000 and $13,000, to her income. In other words, the addition of $9,000 in spousal support and $13,000 in Social Security benefits would increase Michelle's income to $59,000 per year. That leaves Michelle with about $4,916 in income per month, without touching the principal amounts in her investment and retirement accounts.

{¶ 73} Finally, Michelle contends that the trial court should have required John to pay her from his assets despite the fact that he experienced a significant reduction in

income. In support of this proposition, Michelle cites *Gessler v. Gessler*, 2d Dist. Montgomery No. 16220, 1997 WL 254152 (May 16, 1997). According to Michelle, we ruled in *Gessler* that "the Appellant had sufficient assets from which to pay spousal support in spite of his decreased income due to retirement." Appellant's Brief, p. 15. However, we made no such statement, as the appellant in *Gessler* sought modification of his spousal support obligation after his employment had been terminated, not upon retirement. *Id.* at *1.

{¶ 74} Furthermore, we never held that the appellant had sufficient assets from which to pay spousal support, despite (in that case) his termination. Instead, we only indicated that on remand, the court could consider his assets and present ability to pay. This is nothing more than was done here, as the trial court considered both parties' assets and present ability to pay. We did not indicate that a party must deplete assets earned after marriage in order to continue paying the amount of spousal support that was originally ordered.

{¶ 75} In *Gessler*, the trial court refused a modification and criticized the fact that the appellant had retained nearly all the parties' assets after the divorce and had maintained "a luxurious lifestyle while attempting to deny [his ex-wife] a sustenance living." *Id.* at *5. We noted that the trial court's recitation of facts was incorrect, and that, at the time of divorce, there were "meager marital assets to divide." *Id.* at *6. We also commented that: "[i]n the years following the divorce, Mr. Gessler's career undeniably flourished. The record reveals that he soon was earning a six-figure salary with stock options, bonuses, a good pension, and a substantial severance package upon his termination. Nothing in the record supports the trial court's assertion, however, that

Mr. Gessler financed his comfortable post-divorce lifestyle *with anything other than assets earned after the parties' 1986 divorce*. Thus, the trial court erred to the extent it found otherwise and allowed that perception to color its judgment." (Emphasis added.) *Id*.

{¶ 76} We reversed the case on procedural grounds and indicated that, on remand, if the trial court found a substantial change in circumstances, it could decide if spousal support were still necessary, and, if so, in what amount. We also said that in making this decision, the court remained free to consider the appellant's "assets and present ability to pay along with all other statutory factors." *Id.* at *6.

{¶ 77} Notably, R.C. 3105.18(C)(1)(i) does require courts to consider the parties' "relative assets and liabilities," which is what we indicated in *Gessler* by stating that the trial court was free to consider the appellant's assets and other statutory factors. In the case before us, both parties had substantial assets and retirement accounts. This is not a situation where Michelle was being deprived of a sustenance living; she has ample retirement and other funds without being required to liquidate her assets.

{¶ 78} Furthermore, R.C. 3105.18(C)(1)(a) requires courts to consider "[t]he income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code" (which pertains to division of martial property). This was exactly the approach taken in the present case, by calculating the income both parties could earn from property that had been divided at the time of the divorce.

{¶ 79} Based on the preceding discussion, the Second Assignment of Error is without merit and is overruled.

IV.   Alleged Error in Calculating Spousal Support

**{¶ 80}** Michelle's Third Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion in Calculating Appellee's Spousal Support.

**{¶ 81}** Under this assignment of error, Michelle contends that the trial court abused its discretion in calculating spousal support.   Most of Michelle's argument challenges the income calculations of Allen Duvall, John's expert, and the trial court's reliance on those calculations.   We need not address these matters further, as we have already discussed them in connection with the resolution of the Second Assignment of Error.   One matter that we did not address previously is Michelle's contention that the trial court improperly concluded that John had $2,000 annually in future medical expenses due to travel costs for medical treatment.   Michelle claims there was no testimony from either John or his expert to support this fact.

**{¶ 82}** In objecting to the magistrate's decision, Michelle argued that the magistrate erred in relying on the testimony of Duvall, who stated that John would incur around $2,000 yearly in expenses in traveling to Cleveland for medical treatments.   The trial court rejected Michelle's objection, noting John's testimony that after retirement, he was continuing on Woolpert's medical plan, but would be required to pay the maximum amount of out-of-pocket expenses, roughly around $500 per month.   In view of this testimony, the trial court found Duvall's estimate conservative.

**{¶ 83}** We fail to see the relevance of Michelle's concern about this matter.   The trial court did not base its spousal support modification on these medical expenses, but simply overruled Michelle's objection.   Furthermore, Michelle failed to submit evidence

indicating that John would not have future medical expenses or expenses to travel to Cleveland several times a year for medical treatment.

{¶ 84} Michelle also presents arguments under this assignment of error that relate to her Ninth Assignment of Error, which contends that the trial court erred in computing John's spousal support arrearage. In order to avoid confusion, we will address these points when we consider the Ninth Assignment of Error.

{¶ 85} Another argument that Michelle appears to make (while not explicitly stating it as such) is that courts should not reduce spousal support below the percentage of an obligor's income that was allocated by the initial award. As an illustration, Michelle contends that since she was originally given 33% of John's base salary, the reduction to only 14% of John's "modified salary" of $62,300 was inappropriate.

{¶ 86} As an initial point, John's salary was not modified; his salary ceased to exist. The trial court simply commented that since John had retired, his income had been reduced by 80%. Dec. 12, 2017 Decision and Judgment at p. 22. In view of all the factors considered, the court found it reasonable to modify the support obligation by that percentage.

{¶ 87} There is no requirement in R.C. 3105.18 that the relative percentages of support awarded from an obligor's income must remain the same when support is modified. This could actually be deemed arbitrary, insofar as it would eliminate consideration of the statutory factors or the specific needs of parties. Consequently, comparisons between Michelle's current percentage of John's income and her prior percentage of his income are not pertinent. Both parties will have roughly equal retirement income.

{¶ 88} In *Kozlevchar v. Kozlevchar*, 8th Dist. Cuyahoga No. 76065, 2000 WL 640614 (May 18, 2000), the court of appeals held that a reduction in spousal support of more than 50% was warranted because the obligor had to retire due to poor health and his income had been reduced by more than half. *Id.* at *3. Unlike Michelle's suggestion of rigidly restricting support to the original percentage of an obligor's income, *Kozlevchar's* approach is not unreasonable. Again, of course, the other statutory factors must be considered. Here, the trial court did consider the statutory factors.

{¶ 89} In 2016, John earned about $326,512 at Woolpert, and this is the figure the trial court used in concluding that John had an 80% decrease in income when he retired. The amount John would receive from his Woolpert pension, 401(k) account, Social Security pension, and income from redemption of his Woolpert stock ($62,300, before tax), was slightly less than 20% of John's prior salary ($65,302.40 is 20% of $326,512). Thus, the 80% reduction the trial court used actually worked in Michelle's favor, as the court could have found that John's anticipated income would be less than 80% of his income before retirement.[6]

{¶ 90} Based on the preceding discussion, the Third Assignment of Error is overruled.

### V. Failure to Issue Order Requiring Payment of Arrearage

{¶ 91} Michelle's Fourth Assignment of Error states that:

---

[6] The trial court did not explicitly refer to John's 2016 earnings, but $326,512.64 is the figure the magistrate used and is also the figure reported on John's 2016 W-2. *See* Plaintiff's Ex. 11A. $62,300 is only about 19% of John's 2016 earnings; .19 times $3,750 (the prior amount of spousal support) would have resulted in monthly spousal support payment of $712.50.

The Trial Court Erred in Failing to Issue an Order Requiring Payment

of Appellee's Spousal Support Arrearage or Indicating that Payment Was

to be Made.

**{¶ 92}** Under this assignment of error, Michelle contends that the trial court erred in failing to issue an order requiring John to pay a spousal support arrearage that John allegedly owed. As was noted, Michelle filed a motion for contempt alleging that John failed to pay spousal support as ordered. During the hearing, John's expert indicated that John owed Michelle around $70,000 for payment on past bonuses, and the expert used this amount in his calculations for the parties' 2017 income.

**{¶ 93}** The magistrate's decision overruled Michelle's motion for contempt, and did not order John to make any payment. Although Michelle objected to the denial of her motion for contempt, she did not object to the magistrate's failure to order John to pay the $70,000. The trial court's decision also did not order John to pay this amount.

**{¶ 94}** Ohio Civ. R. 53(D)(3)(b)(iv) provides that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)."

**{¶ 95}** By failing to object, Michelle waived error other than plain error. *Neer v. Neer*, 2d Dist. Montgomery No. 25876, 2014-Ohio-142, ¶ 11. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial

process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.

**{¶ 96}** We find nothing warranting application of the plain error doctrine. If John fails to pay Michelle the money he owes, Michelle has a remedy in the trial court.

**{¶ 97}** Accordingly, the Fourth Assignment of Error is overruled.

## VI. Alleged Procedural Error in John's Objections

**{¶ 98}** Michelle's Fifth Assignment of Error states that:

The Trial Court Erred in Considering Appellee's [Objection] to the Income of the Parties Raised in Appellee's Objections to the Magistrate's Decision as They Were Not Properly Raised at Trial.

**{¶ 99}** Under this assignment of error, Michelle contends first that John's objections (presumably to the magistrate's calculation of the parties' income) were waived because John failed to state his objections with specificity. Michelle also argues that John's supplemental objections were improper because he raised additional issues.

**{¶ 100}** These arguments reflect misunderstanding of the way Civ.R. 53 operates. Under Civ.R. 53(D)(3)(b)(i), objections to a magistrate's decision must be filed within 14 days after the decision has been filed. This is a short period of time, and Civ. R. 53(D)(3)(b)(iii) provides that a party may seek leave of court after the transcript is filed in order to supplement the objections. The 2006 Staff Notes to Civ.R. 53 specifically state that "[t]he last sentence of Civ.R. 53(D)(3)(b)(iii) allows an objecting party to seek leave of court to supplement previously filed objections where the additional objections become apparent after a transcript has been prepared." Thus, even if parties fail to initially raise

a particular objection, they may do so later if they have properly asked for permission to supplement their objections.

{¶ 101} This process was followed here. John's initial objections to the magistrate's decision raised three objections, including an objection "to the Magistrate's calculation of the parties' incomes as there has been an improper calculation of both parties' incomes." July 26, 2017 Initial Objections to the Magistrate's Decision filed July 17, 2017, p. 1. John also objected to the award of spousal support as unreasonable and inappropriate given the totality of the evidence, and to the award of $500 for attorney fees. *Id.* Finally, John's initial objections asked for an additional 14 days after the transcript was filed, so that he could supplement his objections. The transcript was filed on July 27, 2017, and John then timely asked the court on August 9, 2017, for an additional 14 days to supplement his objections. The court granted his request, and John filed supplemental objections on August 24, 2017.

{¶ 102} In the supplemental objections, John again objected to the magistrate's calculation of income, and added additional detail. Among other things, he mentioned the magistrate's inclusion of $91,000 gained through redemption of Woolpert stock and the magistrate's failure to include Michelle's pension money as part of her income. These arguments fell within what John had previously raised in his initial objection.

{¶ 103} Moreover, even if John's initial objections were only general (which they were not), allowing specific supplemental objections to be filed after the initial filing of general objections is done as a matter of course. *See, e.g., In re D.D.J.*, 2d Dist. Montgomery No. 27256, 2017-Ohio-4202, ¶ 3; *Dunn v. Dunn*, 2d Dist. Clark No. 05-CA-104, 2006-Ohio-4649, ¶ 6; *In re J.T.,* 2d Dist. Montgomery No. 26839, 2016-Ohio-602,

¶ 12; *In re E.K.*, 7th Dist. Jefferson No. 17 JE 0005, 2017-Ohio-7709, ¶ 21; *Hendrickson v. Parrett*, 12th Dist. Butler No. CA2014-01-010, 2014-Ohio-3997, ¶ 6.

**{¶ 104}** Michelle further contends that the issue of calculation of incomes was not properly raised during the hearing because John failed to object to testimony or exhibits that concerned the parties' incomes. This comment misapprehends the nature of what occurred. At the hearing, the parties both presented testimony and exhibits about their incomes. Most of this was not really in dispute, since income reflected on W-2 statements or calculated by a pension provider is readily ascertained. For example, there was no dispute that John was to receive $17,300 yearly from the Woolpert pension, and that Michelle was entitled to receive $13,200 per year from the same pension fund. There was also no dispute about the amounts John was entitled to receive based on the redemption of his Woolpert stock; these amounts were reflected on Plaintiff's Ex. 14A. As a result, there would have been no need to object to the admission of such evidence at the hearing.

**{¶ 105}** However, what could have been the basis of an objection was how the magistrate allocated particular items as "income" for purposes of calculating spousal support. Since the magistrate's decision included John's stock redemption within his income and did not include any income other than $3,000 for Michelle, John objected, even though the amount of the individual items was not disputed.

**{¶ 106}** As a final matter, Michelle argues in her reply brief that John did not properly preserve his objections to the calculation of spousal support because he has not directed us, pursuant to App.R. 16A)(6) and (D), to places in the record that relate to his argument.

{¶ 107} This argument is perplexing. John is an appellee with respect to the calculation of spousal support, and he is not challenging the trial court's decision about support. Michelle, as an appellant challenging the trial court's decision on spousal support, "bears the burden of not only formulating an argument on appeal and supporting that argument with legal authority, but also *'with citations to * * * parts of the record on which the appellant relies.'*" (Emphasis sic.) *Choi v. Choi*, 9th Dist. Summit No. 28568, 2018-Ohio-725, ¶ 13, quoting App.R. 16(A)(7).

{¶ 108} Of course, App.R. 16(B) does impose a requirement on appellees to comply with App.R. 16(A)(1)-(A)(8). However, appellees have no burden to demonstrate error (and, indeed, doing so would be counterproductive, since they are in the position of attempting to uphold the judgment). Instead, appellees are required to cite to transcripts or legal authorities to assist appellate courts in resolving the issues. *See Molz v. Gearhart*, 4th Dist. Meigs No. 07CA10, 2008-Ohio-4423, ¶ 1 (agreeing with appellant's argument that the trial court erred in requiring pre-trial bond "because appellees did not cite to any authority in their brief as required by App.R. 16(B), and because we [the appellate court] could not find any law that would allow the court to require such a bond").

{¶ 109} Consequently, an appellee who fails to cite to the record or to relevant authority runs the risk of having the trial court's judgment reversed, even though appellate courts will attempt to find the correct answer, even where briefs are deficient. The most perplexing part of Michelle's argument, however, is that John did, in fact, cite extensively to the record and to exhibits in his brief.

{¶ 110} Based on the preceding discussion, the Fifth Assignment of Error is overruled.

VII.   Failure to Include Income of John's Spouse

{¶ 111} Michelle's Sixth and Seventh Assignments of Error are interrelated and will be considered together.   These assignments of error, respectively, state as follows:

The Trial Court Erred and Abused Its Discretion by Not Including the Income of Appellee's Wife in Determining Appellee's Income for Purposes of Determining if a Change in Circumstances Had Occurred for Purposes of Modifying Spousal Support.

The Trial Court Erred and Abused Its Discretion by Not Considering the Benefit Appellee Receives from Sharing Living Expenses With His Second Spouse.   The Trial Court's Conclusion Regarding Their Shared Expenses Is Not Supported by the Evidence.

{¶ 112} Under this assignment of error, Michelle argues that the trial court erred in refusing to add John's current wife, Linda, as an indispensable party and in failing to consider her income and assets.   Michelle further contends that the trial court abused its discretion by failing to consider the benefit that John receives from sharing his living expenses with Linda.

{¶ 113} As to the first argument, Michelle filed a motion on March 31, 2017, seeking to add John's current wife as a "co-plaintiff" pursuant to "Civ.R. 17(A)."   The magistrate denied the motion on May 5, 2017.   Michelle failed to object to the magistrate's decision, however, and her arguments on this point have been waived.   *See* Civ.R. 53(D)(3)(b)(iv).   Furthermore, as to plain error, we see nothing that could constitute a miscarriage of justice.

{¶ 114} Civ.R. 75(B) provides that Civ.R. 19 (joinder) and Civ.R. 19.1 (compulsory joinder) "shall not apply in divorce, annulment, or legal separation actions." The rule provides an exception when "[a] person or corporation having possession of, control of, or claiming an interest in property, whether real, personal, or mixed, out of which a party seeks a division of marital property, a distributive award, or an award of spousal support or other support, may be made a party defendant * * *."

{¶ 115} These circumstances do not apply here, as there was no indication that Linda claimed an interest in property from which an award of spousal support was being made. Furthermore, joinder "is within the discretion of the court and its purpose is to allow individuals to join whose interests need to be protected." *Huener v. Huener*, 110 Ohio App. 3d 322, 327, 674 N.E.2d 389 (3d Dist.1996). In *Huener*, the court indicated that parents of a divorcing party should have been joined, because the trial court had attempted "to divest them of their legal title without joining them as parties." *Id.*

{¶ 116} Similarly, Civ.R. 17(A) (although not applicable here) requires that actions "be prosecuted in the name of the real party in interest." A real party in interest has been described as " 'one who has a real interest in the subject matter of the litigation, and not merely an interest in the action itself, i.e., one who is *directly* benefitted or injured by the outcome of the case.' " (Emphasis sic.) *Shealy v. Campbell*, 20 Ohio St.3d 23, 24, 485 N.E.2d 701 (1985), quoting *W. Clermont Edn. Assn. v. W. Clermont Local Bd. of Edn.*, 67 Ohio App.2d 160, 162, 426 N.E.2d 512 (1st Dist.1980). *Accord Ohio Valley Associated Builders & Contrs. v. DeBra-Kuempel*, 192 Ohio App.3d 504, 2011-Ohio-756, 949 N.E.2d 582, ¶ 26 (2d Dist.). From this perspective as well, John's current wife was not a real party in interest. While Linda might indirectly benefit from a reduction in support, or might

indirectly be affected by denial of John's motion, there was no potential of direct benefit or injury. Moreover, Michelle had other many other ways to obtain information about Linda's income, including discovery requests, taking her deposition, or subpoenaing Linda to testify at trial.

{¶ 117} R.C. 3105.18(C)(1) does not specifically list a spouse's income as a factor to be considered, but does indicate that courts may consider "[a]ny other factor that the court expressly finds to be relevant and equitable." R.C. 3105.18(C)(1)(n). We have noted that while "a new spouse's income cannot be considered in determining an obligor's ability to pay spousal support, it is appropriate for a court to consider the fact that the obligor directly benefits from sharing living expenses with his new spouse." *Manzella v. Manzella*, 2d Dist. Montgomery No. 20618, 2005-Ohio-4519, ¶ 12.

{¶ 118} In awarding $2,500 monthly spousal support, the magistrate did not make a finding of such a benefit. When both parties objected to the magistrate's decision, Michelle argued that the magistrate should have considered Linda's income in deciding if a substantial change of circumstances had occurred.

{¶ 119} The trial court acknowledged that there was an "implication" that John's wife worked and contributed to joint household expenses, but concluded that there was insufficient evidence to ascertain the extent to which she was able to contribute. Dec. 12, 2017 Decision and Judgment at p. 18. As was noted, we review the trial court's decision for abuse of discretion. *Denmark*, 2d Dist. Montgomery No. 26438, 2015-Ohio-4292, at ¶ 37. After reviewing the record, we are unable to find that the court's decision was arbitrary, unreasonable, or unconscionable.

{¶ 120} At trial, very little evidence was presented about the current financial

circumstances of John's wife. John submitted tax returns for 2011 through 2015, which were joint returns for himself and his wife, Linda. John testified that during the filing of these tax returns, Linda "was" employed at Wright State University. Tr. at p. 141. John also submitted his last pay statement for his 2017 employment at Woolpert. *Id.* He did not submit a 2016 tax return, which would have shown whether or not Linda was currently employed, and which might have provided a basis for estimating how John benefited from sharing expenses.

{¶ 121} During cross examination, Michelle's counsel did not ask about these matters in any detail; his focus was on John's medical condition, the gross income reflected on John's income tax returns between 2007 and 2015, and payments John had made in connection with his spousal support obligation between 2007 and 2016. Tr. at pp. 155-193. Michelle's counsel did ask if John made the monthly and annual house payments on his residence. John stated that "the money comes from combined incomes." Tr. at 171. No follow-up questions were asked concerning Linda's employment or income, or her specific contributions to house payments or other expenses.

{¶ 122} Michelle had the ability to cross-examine John in detail about Linda's contributions, but she failed to do so. The trial court, therefore, did not err in concluding that Michelle failed to provide sufficient evidence on this point. In addition, more than six months elapsed between the filing of John's initial motion and the evidentiary hearing. There was ample time to conduct a deposition of Linda or even John, but the record does not indicate that any such effort was made. At a minimum, Linda could have been subpoenaed to testify at the hearing. Again, the record reveals no effort in that regard.

{¶ 123} Admittedly, the party seeking modification of spousal support bears the burden of establishing that it is warranted.  *Reveal*, 154 Ohio App.3d 758, 2003-Ohio-5335, 798 N.E.2d 1132, at ¶ 14.  However, this does not mean that parties opposing modification have no duty to present pertinent evidence.  A trial court does not err in rejecting arguments if parties fail to provide facts that would assist the court in making a decision.

{¶ 124} Accordingly, the Sixth and Seventh Assignments of Error are without merit.


VIII.   Alleged Error in Making Findings of Fact and Conclusions of Law

{¶ 125} Michelle's Eighth Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion in Failing to Issue Findings of Fact and Conclusions of Law upon Proper and Timely Motion of Defendant Pursuant to Civil Rule 52.

{¶ 126} According to Michelle, the magistrate erred in failing to issue findings of fact and conclusions of law after being asked to do so.

{¶ 127} Civ.R. 53(D)(3)(a)(ii) provides, in pertinent part, that:

Subject to the terms of the relevant reference, a magistrate's decision may be general unless findings of fact and conclusions of law are timely requested by a party or otherwise required by law.   A request for findings of fact and conclusions of law shall be made before the entry of a magistrate's decision or within seven days after the filing of a magistrate's decision.

{¶ 128} The hearing in this case was held May 30, 2017, and on June 2, 2017,

Michelle filed a request that the magistrate file separate findings of fact and conclusions of law. The request was timely under the rule, and the magistrate's decision, which was filed on July 17, 2017, did, in fact, make findings of fact and conclusions of law.

**{¶ 129}** In a similar context, the Eighth District Court of Appeals commented that:

The purpose of findings of fact and legal conclusions is to enable a reviewing authority to determine the existence of assigned errors and to afford the adverse party adequate due process. * * * A trial court need not discuss every issue that the party raises or engage in an elaborate and lengthy discussion in its findings of fact and conclusions of law; its findings must be sufficiently comprehensive and pertinent to the issues to form a basis upon which the evidence supports the conclusion.

*Knight v. Cleveland Civ. Serv. Comm.*, 2016-Ohio-5133, 76 N.E.3d 321, ¶ 58 (8th Dist.). *See also Werden v. Crawford*, 70 Ohio St.2d 122, 124, 435 N.E.2d 424 (1982) (noting in the context of Civ.R. 52, that the clear purpose of the rule is "to aid the appellate court in reviewing the record and determining the validity of the basis of the trial court's judgment"). Furthermore, substantial compliance is found where a reviewing court can adequately decide the legal issues in light of the record and a well-written trial court opinion. *Creggin Group, Ltd. v. Crown Diversified Industries Corp.*, 113 Ohio App.3d 853, 859, 682 N.E.2d 692 (12th Dist.1996), citing *Stone v. Davis*, 66 Ohio St.2d 74, 84-85, 419 N.E.2d 1094 (1981).

**{¶ 130}** After reviewing the record, we find no basis upon which to conclude that the magistrate's findings of fact and conclusions of law were insufficient to allow the trial court to review the errors that Michelle alleged and to afford her due process. The

decision of the magistrate was detailed, as was the trial court's decision on the objections.

{¶ 131} Accordingly, the Eighth Assignment of Error is overruled.


IX.   Contempt Issues

{¶ 132} Michelle's Ninth Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion in Its Computation of Appellant's Support Arrears and in Dismissing Appellant's Motion to Show Cause.

{¶ 133} Under this assignment of error, Michelle contends that she established by clear and convincing evidence that John was in contempt for failing to pay spousal support.   Michelle's argument is based on her belief that John was required to pay her spousal support even if it involved double-counting John's income.

{¶ 134} After hearing the evidence, the magistrate concluded that Michelle did not present sufficient evidence to prove contempt.   In addition, the magistrate stated that she found "John's testimony and supporting exhibits indicating spousal support payments, competent and reliable."   July 17, 2017 Magistrate Decision at p. 11.   Michelle objected to the magistrate's findings, but after reviewing the record, the trial court agreed with the magistrate.

{¶ 135} Contempt orders are reviewed for abuse of discretion, which, again, means that the trial court acted arbitrarily, unreasonably, or unconscionably.   *State ex rel. Cincinnati Enquirer v. Hunter,* 138 Ohio St.3d 51, 2013-Ohio-5614, 3 N.E.3d 179, ¶ 21.   This standard of review is "highly deferential," and "we will not lightly substitute our interpretation for that of the issuing court."   *Id.* at ¶ 29.

{¶ 136} "Contempt is defined in general terms as disobedience of a court order." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554, 740 N.E.2d 265 (2001). "Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order. * * * Thus, civil contempts are characterized as violations against the party for whose benefit the order was made * * *." *Id*. at 554–555, 740 N.E.2d 265.

{¶ 137} "A prima facie case of contempt is made by establishing a prior court order and a violation of its terms," and contempt findings "must be supported by clear and convincing evidence." *Martin v. Martin*, 179 Ohio App.3d 805, 2008-Ohio-6336, 903 N.E.2d 1243, ¶ 24 (2d Dist.). After a violation is proven, the nonmoving party has the burden of establishing a defense for noncompliance. *Schutz v. Schutz*, 2017-Ohio-695, 85 N.E.3d 481, ¶ 52 (2d Dist.), citing *Wolf v. Wolf*, 1st Dist. Hamilton No. C-090587, 2010-Ohio-2762, ¶ 4.

{¶ 138} As was noted, the parties signed a separation agreement that was incorporated into the divorce decree. The spousal support provision states as follows:

ITEM IV – SPOUSAL SUPPORT

By agreement of the parties, there shall be a two-tier approach to spousal support. <u>Tier One</u> Spousal Support is based on Husband having an annual base salary of $135,000 and upon Wife having zero (0) annual income. Husband, also referred to as Obligor, shall pay to Wife, also referred to as Obligee, spousal support in the amount of $3,750 per month for an indefinite period subject to the limitations described below. Husband's payment of permanent spousal support shall be effective March

1, 2007 and shall continue until terminated by the death of either party or Wife's remarriage. Further, spousal support shall be subject to the continuing jurisdiction of the Court as to amount and duration. This would include jurisdiction to modify spousal support if Wife chooses to inhabit with an unrelated male who contributes to her support. Still further, the Obligor's support obligation shall be tax deductible by the Obligor and tax includable to the Obligee as and for "alimony" pursuant to the applicable provisions of the Internal Revenue Code.

Tier Two Spousal Support shall consist of Wife receiving 35% of (1) any of Husband's gross income over his annual base salary of $135,000 and (2) 35% of any of Husband's gross bonus income before taxes. Husband shall provide Wife with verification of any raises in income and/or receipt of any such bonuses and shall pay to Wife her share of each within seven (7) days of receipt. Husband's payment of Tier Two Spousal Support shall be effective March 1, 2007 and shall continue until terminated by the death of either party, Wife's remarriage, or further order of the Court. Further, spousal support shall be subject to the continuing jurisdiction of the Court as to amount and duration. This would include jurisdiction to modify spousal support if Wife chooses to cohabit with an unrelated male who contributes to her support. Still further, the Obligor's spousal support shall be tax deductible by the Obligor and tax includable to the Obligee as and for "alimony" pursuant to the applicable provisions of the Internal Revenue Code.

Doc. #32, Separation Agreement at pp. 3-4.

{¶ 139} At the hearing, John submitted all his W-2s from 2007 through 2016, and his final pay stub for 2017.   John testified that his only income came from Woolpert and that he had a savings account that earned 1% a year and might have earned $50 to $100 per year.   John also testified in detail about Plaintiff's Ex. 17, which showed the payments he made to Michelle through 2017, as well as underlying documents, including copies of letters, checks, and receipts of payments made both to CSEA and Michelle.

{¶ 140} When Michelle objected to the magistrate's decision, she included a chart, pursuant to which she claimed she was owed $599,310.22 based on 35% of John's gross income from 2007 through 2016, plus $75,498, based on 35% of John's bonuses from 2007 through 2016 that she claimed had not been paid.   The total claimed amounts added up to $674,808.69.   July 28, 2017 Defendant's Objections to Magistrate's Decision, p. 24.

{¶ 141} Based on this chart, Michelle apparently took the position that she was entitled to $3,750 per month in spousal support ($45,000 per year), plus 35% of John's income over $135,000, as well as 35% of his bonuses, even if this resulted in double-counting of income.   However, the agreement does not provide for such double-counting. It is clear from the agreement that the listed amounts of additional spousal support should be calculated separately, not considered together, and then recounted.   An illustration from the documents provided reveals that Michelle's interpretation is strained and incorrect.

{¶ 142} For example, the chart that Michelle filed with her objections claims that for "Tier Two" spousal support for the year 2007, John owed her a total of $327,957.14.

This was based on two separate calculations.   First, Michelle noted that John had gross income of $612,487.84 in 2007, that his income, minus $135,000, was $477,487.84, and that 35% of the latter amount was $167,120.74.   Michelle claimed she was paid nothing of this amount, and that John, therefore, owed her $167,120.74.

{¶ 143} Michelle's calculation of the bonus part of Tier Two support noted that John had a 2007 bonus amount of $469,673, that 35% of this amount was $160,836.40, and that, according to her, John claimed he had paid nothing.[7]   Michelle asserted that an arrearage of $1,006.50 existed on that amount.   Thus, under Michelle's interpretation of the separation agreement, John still owed her a total amount of $168,127.24 for 2007, regardless of what he had previously paid.   The total of the amounts claimed for "Tier Two" support for 2007, therefore, amounted to $327,957.14.

{¶ 144} The parties were divorced on March 9, 2007.   The separation agreement indicated that the prior temporary support order would remain in effect until February 28, 2007, and that any support arrearage was waived.

{¶ 145} John's last payroll statement for 2007, which shows his wages, including his bonus, indicates that he earned a total of $612,487.84 in gross income in 2007.   *See* Plaintiff's Ex. 12L.   $469,673 of the amount included within his gross income was bonus income, meaning that John earned $142,814.84 of other income from Woolpert that year. Subtracting $135,000 from $142,814.84 leaves $7,814,84, and 35% of that amount is $2,735.19.   This would be the amount that John was required to pay under the first part of Tier Two support.

{¶ 146} As was noted, the 2007 bonus amount was $469,673.   35% of $469,673

---

[7] There is no evidence that John ever made such a claim.

is $164,385.55, which was the amount of spousal support John owed for his bonus income. Consequently, the total amount owed in 2007 for Two Tier support would have been $167,120.74 ($164,120.74 plus $2,735.19).

{¶ 147} In 2007, John paid Michelle the following amounts after the divorce decree was filed: spousal support of $33,750 from April to December 2007; $3,750 for a spousal support arrearage in March 2007; $39,078.90 for Michelle's share of his April bonus; $3,685.50 for her share of the August bonus; and $118,072 for her share of the December bonus. The total is $37,500 for regular spousal support payments, and $160,836.40 for other spousal support.

{¶ 148} A discrepancy of about $6,284.34 exists between the amount paid and the amount owed. However, neither side discussed this amount at trial, and John testified that he believed he had complied with the requirements in the decree. As was noted, the magistrate found John's testimony and documents credible.[8]

{¶ 149} In any event, Michelle never testified that she failed to receive this money, nor did she testify at trial that she failed to receive any of the money that John indicated he had paid her. Her statement was that she did not know if she received any payment for 35% of John's gross income in 2007. Tr. at p. 199. That was Michelle's sole testimony about what she did or did not receive from John from 2007 through 2017 under the spousal support provisions.

{¶ 150} As was noted, the chart Michelle included in her objections indicated that John owed her $327,957.14 under Tier Two spousal support. This was based on

---

[8] While this point was not discussed at trial, the documents that were admitted indicate that the bonuses in 2007 were awarded quarterly. Thus, John could have received a bonus prior to the time the divorce was granted.

double-counting the bonus money. First, Michelle took 35% of John's income over $135,000 ($477,487.84), and then took 35% of his bonus income ($469,763), which had already been included in the $477,487.84 gross income amount. *See* Defendant's Objections to Magistrate's Decision, filed July 28, 2017 at p. 23. On the face of the document, the only logical reason for separating consideration of gross income over $135,000 and bonus income is that any given year, John might not have been paid more than $135,000, or conversely, he might not have been paid a bonus (which did occur).

{¶ 151} "A separation agreement is a contract and, as such, is subject to the same rules of construction that apply to other contracts." *Troha v. Troha*, 105 Ohio App.3d 327, 332, 663 N.E.2d 1319 (2d Dist.1995). " 'If the decree is clear and unambiguous, its interpretation is a matter of law and will be reviewed de novo. On the other hand, if the document is ambiguous, there is a question of fact to be resolved by the trial court, and therefore our review is abuse of discretion. The threshold question of whether an ambiguity exists is a question of law that we review de novo.' " *Emery v. Emery*, 2d Dist. Darke No. 04CA1639, 2005-Ohio-207, ¶ 11, quoting *Peters v. Peters*, 2d Dist. Montgomery No. 18445, *2 (Feb. 23, 2001).

{¶ 152} In *Emery*, we noted that "[w]hile the separation agreement's clarity might be improved by a better segregation of these terms and conditions, the rights and duties they impose are sufficiently clear and unambiguous to allow a court to construe them." *Emery* at ¶ 27. The same observations can be made here. Moreover, Michelle's suggested interpretation is implausible.

{¶ 153} As was indicated, the magistrate found John's testimony and documents credible and reliable. Again, we defer to trial court decisions on credibility. *Seasons*

*Coal Co.*, 10 Ohio St.3d at 80, 461 N.E.2d 1273. John's expert, Allen Duvall, also checked the underlying documentation and found it materially reliable. Again, both the magistrate and trial court found Duvall credible.

**{¶ 154}** In her brief, Michelle makes a number of comments on Duvall's testimony about dividends. Michelle's remarks are confusing, and to the extent they can be deciphered, they indicate a misunderstanding of Duvall's testimony. Duvall discussed the fact that excess corporate income and income that is in excess of salaries should normally be distributed to shareholders as dividends. This results in double taxation to the corporation because it is taxed on income left in the company and income paid out as dividends. According to Duvall, if Woolpert had followed this normal course, John's bonuses would not have fallen under Tier Two support, and spousal support would not have been properly paid on these amounts.

**{¶ 155}** However, because Woolpert chose to save itself tax money by distributing dividends as bonuses, Duvall assumed that all the money distributed as "bonuses" was subject to the Tier Two spousal support calculation. Duvall then conducted an analysis like the one we just did, and concluded, after comparing the income on John's W-2s with the amounts paid, that the net bonus amount due from John that had not been paid was about $80,000. Tr. at p. 71.[9]

**{¶ 156}** The trial court concluded that Michelle failed to provide clear and convincing evidence of contempt, and we agree. According to John's testimony, which

---

[9] This is slightly more than the $70,000 amount Duvall used in his calculations of the parties' 2017 income. However, John's testimony indicated that he had escrowed $11,000 that he had not yet paid Michelle for her share of the 2017 bonus. He also indicated that he was ready and willing to pay it. In any event, no one discussed this issue.

was found to be credible, John paid the amounts that he thought were due. In addition, Michelle's interpretation of the contract language and computation of support due is simply wrong. Accordingly, the Ninth Assignment of Error is overruled.

XI.

{¶ 157} Michelle's Tenth Assignment of Error states as follows:

> The Trial Court Erred and Abused Its Discretion in Finding that Appellee's Income Does Not Include Distributions from the Redemption of His Stock.

{¶ 158} We have already considered this issue in our discussion of the Second Assignment of Error and need not address it further. Because Michelle's argument is without merit, the Tenth Assignment of Error is overruled.

XI. Abuse of Discretion in Admission of Deposition

{¶ 159} John has presented one cross-assignment of error, which states that:

> The Trial Court Erred and Abused Its Discretion When It Sustained Defendant's Objection to the Admission of a Medical Expert in Conflict With the Trial Court's Orders.

{¶ 160} Under this assignment of error, John contends that the trial court erred in refusing to consider his doctor's deposition because the deposition was not timely filed. Although the court refused to consider the deposition, it concluded that, even without the deposition, John had presented sufficient credible and undisputed evidence about his medical treatment, prognosis, and treatment options to support the magistrate's decision.

{¶ 161} We review decisions to admit or exclude evidence for abuse of discretion. *State v. Cassel*, 2016-Ohio-3479, 66 N.E.3d 318, ¶ 13 (2d Dist.). The trial court's decision was based on the fact that John did not timely file the deposition and did not seek leave of court to file the deposition at a later time for good cause shown. In addition, the court observed that it could not find an indication that the deposition was ever filed, although the magistrate had signed an entry allowing John to do so.

{¶ 162} Civ.R. 32(A) requires that "[e]very deposition intended to be presented as evidence must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing." The purpose of the rule is "to prevent surprise to the party against whom the deposition is to be used and to place the document with the court prior to the proceedings." *Evans v. Smith*, 75 Ohio App.3d 160, 164-65, 598 N.E.2d 1287 (1st Dist.1991). *Accord Weiner v. Kwait*, 2d Dist. Montgomery No. 19289, 2003-Ohio-3409, ¶ 145.

{¶ 163} At the hearing, Michelle objected to admission of Dr. Litscher's deposition because the transcript had not been timely filed. Tr. at pp. 134-135. In response, John's counsel indicated that, the previous week, and more than one day in advance of trial, Michelle's counsel had refused, during an ex-parte communication with the trial judge, to let the judge sign off for the magistrate with respect to the filing of the deposition. In light of that fact, John's counsel asserted that Michelle's objection to admission of the deposition was disingenuous. Tr. at pp. 136-137.

{¶ 164} After listening to the parties, the magistrate noted that she had already told John's counsel that she would sign an entry to allow the deposition to be filed. The magistrate also asked that the deposition be marked as an exhibit for her consideration.

Tr. at p. 138. The deposition video and transcript were then marked as Plaintiff's Ex. 32 and were placed in an envelope. Tr. at p. 139. Later, during a break in the hearing, the magistrate gave John's counsel the signed entry. Tr. at p. 160. At the end of John's case, the magistrate admitted John's exhibits, including Ex. 32. Tr. at p. 195.

{¶ 165} The motion to file the deposition and the entry granting permission were filed the same day, on May 30, 2017. However, the deposition was not actually filed, as the trial court noted. Under the circumstances, John's counsel may reasonably have assumed that he had satisfied the filing requirement, because the deposition had been admitted into evidence.

{¶ 166} There was also no surprise, because opposing counsel was well aware of the deposition and, in fact, had previously objected to the taking of the deposition. The magistrate overruled these objections on May 5, 2017, and overruled them again on May 18, 2017. In the May 18, 2017 entry, the magistrate stressed that "[t]he May 5, 2017 Magistrate Order put the defendant [Michelle] on notice that the court was granting plaintiff's request for a perpetuation deposition." May 18, 2017 Entry & Order, pp. 1-2.

{¶ 167} Thus, an argument can be made that the trial court erred in excluding the deposition. However, even if we assume for purposes of argument that the trial court erred, any error was harmless because it did not affect the result. *See, e.g., Lykins v. Miami Valley Hosp.*, 157 Ohio App.3d 291, 2004-Ohio-2732, 811 N.E.2d 124, ¶ 54 (2d Dist.) (error in excluding expert's deposition was not prejudicial); *McNeilan v. The Ohio Univ. Med. Ctr.*, 10th Dist. Franklin No. 10AP-472, 2011-Ohio-678, ¶ 16 (exclusion of expert report was not prejudicial).

{¶ 168} Specifically, the trial court held that even absent the doctor's testimony,

John had submitted sufficient credible and reliable evidence about his medical diagnosis and treatment, which supported the court's finding of a substantial change of circumstances. As a result, John suffered no prejudice.

{¶ 169} Accordingly, John's cross-assignment of error is overruled.

## XII. Conclusion

{¶ 170} All of Michelle's assignments of error having been overruled, and John's cross-assignment of error having been overruled as well, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

Brian A. Sommers
Craig M. Sams
Thomas M. Dineen
Hon. Timothy D. Wood